[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
This declaratory judgment action is before the Court for decision following a non-jury trial. It was brought pursuant to a settlement agreement between the parties, Medical Malpractice Joint Underwriting Association of Rhode Island (hereinafter Plaintiff or MMJUA) and Richard Lyons (hereinafter Defendant or Lyons). At issue is the available amount of liability insurance coverage in the underlying medical malpractice claim. The Plaintiff, MMJUA, asserts that the plain language of the policy limits coverage to the single "medical incident" amount of $100,000 and the Defendant, Lyons, counters that there are two compensable "medical incidents" under the terms of the policy.
 FACTS AND TRAVEL
The underlying facts in this case are basically undisputed. Richard Lyons, who ultimately proved to be a diabetic suffering various complications, became a patient of Dr. Doe,[1] in 1972. Throughout their doctor-patient relationship, Dr. Doe was negligent, by acts and omissions, in his medical treatment of Lyons. For example, on his very first visit to the doctor, Lyons' blood pressure was much higher than normal for a man of 32 years and indicative of a well-known malady called hypertension; yet, Dr. Doe took no action. Lyons' blood pressure was such that it required proper medication and continuous monitoring; nevertheless, Dr. Doe failed to address the condition. Then, in 1986, Dr. Doe diagnosed Lyons with another ailment, diabetes mellitus, which condition was likely exacerbated by the continued failure to treat the hypertension. Dr. Doe was also clearly negligent in treating the diabetes. He failed to inform Lyons of the gravity of his condition and the need for medication, proper diet, and monitoring; he failed to schedule regular visits; he failed to conduct regular tests of Lyons fasting blood sugar (FBS) levels; he failed to prescribe medication in the proper dosages; he failed to treat Lyons condition aggressively despite consistently high FBS levels; he failed to schedule other appropriate tests, such as hemoglobin A1C test; and, he failed to refer Lyons to a specialist, despite evidence that his condition was not being effectively controlled.
As a result of Dr. Doe's failure to properly treat the diabetes, Lyons became susceptible to other diseases, namely, peripheral vascular disease (PVD) and peripheral neuropathy.[2] PVD is a progressive disease marked by a narrowing of the blood vessels, usually in the lower extremities, which restricts blood flow and causes both an increased risk in infection of the feet and an increased risk of injury from infection. Peripheral neuropathy is the degeneration of nerves in the extremities such that the patient loses feeling in those areas. There is no dispute between the parties but that Dr. Doe's negligent treatment of Mr. Lyons' hypertension and diabetes contributed to the early onset and advanced stages of at least one, if not both, of these diseases. It is also undisputed that Dr. Doe was negligent in his treatment of Lyons' diabetes in the coverage year of 1998 when these additional afflictions of Lyons became evident.
On January 19, 1998, Lyons sought Dr. Doe's assistance for treatment of an infection in his left foot which was evidenced by blisters. Dr. Doe treated the infection, but failed to treat it aggressively enough. He failed to order the appropriate antibiotics; he failed to schedule a timely follow-up visit; he failed to order a simple x-ray; he failed to timely refer Lyons to a specialist; and he failed to timely admit Lyons into the hospital for treatment with intravenous drugs. As a direct result of all of these failures, Lyons was subjected to a series of three amputations, ultimately causing him to lose his lower leg below the knee.
On December 16, 1998, Lyons sued Dr. Doe for medical malpractice relative to the amputation of his left leg. While the case was pending, Lyons amended his complaint to include a charge of negligence relative to the treatment of Lyons' diabetes that resulted in the PVD and peripheral neuropathy. Dr. Doe was insured under a professional liability policy and pursuant thereto MMJUA undertook his defense. The parties agreed to settle the case. However, the policy limit amount applicable remained in dispute, causing the parties to enter into a settlement agreement which incorporated a separate Coverage Dispute Agreement. Under the terms of the combined agreement, Dr. Doe was fully released, Lyons was paid $100,000, the maximum amount payable for a single "medical incident," and this declaratory judgment action was commenced in order to determine if the MMJUA was liable for any amount greater than the $100,000. The MMJUA asserts that there was only one continuing "medical incident" encompassing all the care given to Lyons by Dr. Doe. Lyons avers that there were two separate "medical incidents."[3]
 STANDARD OF REVIEW
The Uniform Declaratory Judgment Act grants this Court "the power to declare rights, status, and other legal relations." G.L. 1956 § 9-30-1. The purpose of the Act is to "facilitate the termination of controversies." Capital Properties, Inc. v. State of Rhode Island,764 A.2d 1069, 1080 (R.I. 1999) (quoting Fireman's Fund Ins. Co. v. E.W.Burman, Inc., 120 R.I. 841, 845, 391 A.2d 99, 101 (1978)). The statute is intended to serve as a forum for the determination of the legal rights of the parties in actual controversies. Lamb v. Perry, 101 R.I. 538, 542,225 A.2d 521, 523 (1967). "In issuing a declaratory judgment, a trial judge makes all findings of fact without a jury." Fleet National Bank,Trustee v. 175 Post Road, LLC, 851 A.2d 267, 273 (R.I. 2004) (quotingCasco Indemnity Co. v. O'Connor, 775 A.2d 779, 782 (R.I. 2000)).
 ANALYSIS
The issue to be decided is whether there are one or two compensable "medical incidents" under the terms of Dr. Doe's professional liability policy. The parties agree that resolution turns on the interpretation of the following language in the insurance policy:
 I. COVERAGE AGREEMENTS
 The company will pay on behalf of the insured:
 Coverage M — Individual Professional Liability
 All sums which the insured shall be legally obligated to pay as damages because of injury to which this insurance applies caused by a medical incident which occurs during the policy period arising out of the practice of the insured's profession as a physician, surgeon or dentist.
 III. LIMITS OF LIABILITY
 Coverage M — Individual Professional Liability
 The total of liability of the company for all damages because of all injury to which this insurance applies shall not exceed the limit of liability stated in the policy declaration as "aggregate."
 Subject to the above provision with respect to "aggregate" the total liability of the company for all damages because of all injury arising out of any one medical incident shall not exceed the limit of liability stated in the schedule as applicable to "each medical incident."
 V. ADDITIONAL DEFINITIONS
 When used in reference to this insurance . . . "medical incident" means any act or omission:
 (a) under Coverage M — Individual Professional Liability — (1) in the furnishing of professional medical or dental services by the insured. . . .
 Any such act or omission, together with all related acts or omissions in the furnishing of such services to any one person shall be considered one medical incident.
The Plaintiff asserts that the contract's limitation clause clearly and unambiguously limits the amount of coverage to the $100,000 already advanced because Lyons' injuries resulted from one "medical incident" as it is defined in the policy. This argument suggests that the contract is unequivocal and that the professional services rendered to Lyons that resulted in the amputation are related to the professional services rendered to Lyons that resulted in the PVD and, therefore, constitute one "medical incident." Conversely, the Defendant argues, either that the contract is unambiguous and the medical service that caused the amputation is unrelated to the medical service that caused the PVD; or, the contract is ambiguous when applied to these facts because the phrase "all related acts" is not defined. In either case, the Defendant suggests that the Plaintiff's interpretation is overly broad and that a narrower reading of the phrase "all related acts" logically results in a finding that there were two "medical incidents" pursuant to the terms of the contract.
An insurance policy is a contract between the insurer and the insured.Factory Mutual Liability Ins. Co. of America v. Cooper, 106 R.I. 632, 635,262 A.2d 370, 372 (1970). Therefore, this Court must apply the usual rules of contract interpretation. Sjogren v. Metropolitan Property Casualty Ins. Co., 703 A.2d 608, 610 (R.I. 1997). First, the document must be viewed in its entirety and its language be given its plain, ordinary and usual meaning. W.P. Associates v. Forcier, 637 A.2d 353, 356
(R.I. 1994). A reviewing court must "not deviate from the literal policy language unless we deem the policy to be ambiguous." Town of Cumberlandv. Rhode Island Interlocal Risk Mgmt. Trust, Inc., No. 2002-2-Appeal, 2004 R.I. LEXIS 177, at *15 (Nov. 24, 2004). "If, however, a policy's terms are ambiguous or capable of more than one reasonable meaning, the policy will be strictly construed in favor of the insured against the insurer." Id. (quoting Pawtucket Mutual Ins. Co. v. Gay, 786 A.2d 383, 386
(R.I. 2001) (quoting Sjogren, 703 A.2d at 610)).
When the contract language is clear and unambiguous, each word will be given its usual and ordinary meaning and the parties will be bound by such meaning. Andrukiewicz v. Andrukiewicz, 860 A.2d 235, 2004 R.I. LEXIS 175 (Nov. 12, 2004). In ascertaining the usual and ordinary meaning of contractual language, every word of the contract should be given meaning and effect; an interpretation that reduces certain words to the status of surplusage should be rejected." Id. The contract is ambiguous if, after applying these established rules of interpretation, it is reasonably susceptible to more than one interpretation. W.P. Associates,637 A.2d at 356. Still, "because ambiguity lurks in every word, sentence, and paragraph in the eyes of the skilled advocate," Garden CityTreatment Ctr., Inc. v. Coordinated Health Partners, Inc., 852 A.2d 535,542 (R.I. 2004) (quoting Textron, Inc. v. Aetna Casualty and Surety Co.,638 A.2d 537, 541 (R.I. 1994)), a court must be careful not to "stretch its imagination" in order to find one. Id.
With these rules in mind, the initial task of this Court is to determine whether the word, "related," as it is used in the phrase "all related acts" to define "medical incident" is capable of more than one reasonable interpretation in the context of this policy and under this set of circumstances. The Plaintiff admits that Dr. Doe "never attended to any condition exhibited by Lyons with the requisite care and confidence required of a primary care physician." (Plaintiff's Post Trial Memo at 24.) Plaintiff argues that "related" has a very broad meaning which easily connects, both logically and causally, all of the medical services rendered to Lyons by Dr. Doe over the course of their 25-year doctor-patient relationship. Id. at 24. Logically, the doctor's acts are all related because they were consistent and continuing failures to render proper treatment to one patient, Lyons. Causally, the doctor's acts were related because the failure to properly treat the diabetes caused the early onset of the PVD and the PVD caused the infection which ultimately caused the doctor's failure to treat the infection. The Defendant counters that the word, "related," must be more narrowly interpreted to encompass only those acts that are causally related. Furthermore, the Defendant insists that the failure to properly treat the diabetes did not cause the failure to properly treat the infection: in other words, the improper treatment of the diabetes caused the early onset of the advanced PVD; while the separate, but equally negligent, treatment of the infection caused the excessive amputation. Without deciding whether "related" necessarily connotes either a logical or causal connection or both, this Court finds that the Defendant's narrower interpretation is more reasonable in light of the policy language and the medical facts. The undefined phrase, "all related acts" renders the limiting term "medical incident" ambiguous at best.
While the Rhode Island Supreme Court has not directly addressed this issue, a review of the case law in other jurisdictions reveals that the breadth of the word, "related," in professional liability policies has been frequently litigated with varying results. See e.g., Beale v.American Nat'l Lawyers Ins. Reciprocal (Risk Retention Group), 843 A.2d 78
(Md. 2004) (lawyer's negligent acts representing siblings do not "arise out of the same, related, or continuing Professional services" where, despite the same acts of one attorney being at issue, separate duties were breached; "`related' is ambiguous"); cf. Bay Cities Paving Grading, Inc. v. Lawyer's Mutual Insurance Co., 855 P.2d 1263 (Cal. 1993) ("a series of related acts" treated as a single claim where "a single
client seeks to recover from a single attorney alleged damages based on asingle debt collection matter" . . . "as used in this policy and these circumstances, `related' is not ambiguous" (emphasis in original)). The Beale Court determined that the duty owed to separate clients was contemplated by the very nature of a lawyer's professional liability policy so that a single act, if it violated a duty to more than one client, was not a "related act." The Bay Cities Court determined that in order for a claim to be separate, as contemplated by the lawyer's liability policy, there had to be a separate injury giving rise to a separate cause of action. When construing the term as it is used in medical malpractice policies, courts focus on the intended policy coverage as applied to the facts and circumstances of the medical relationship. See Doe v. Illinois St. Med. Inter-Ins., 599 N.E. 2d 983
(Ill.App. 1992) (the term "related acts" was ambiguous for several reasons based on the wording of two consecutive policies, and the doctor's acts were unrelated where the acts in treating the diabetic patient created new conditions which required independent acts of treatment); cf. RCA Mutual Ins. Co. v. Sanborn, 918 S.W. 2d 893 (Mo. 1996) (the policy, which defined "medical incident" exactly as it is defined in the case at bar, was not ambiguous, and the surgeon's acts were related; but there were three surgeries on one hip, by one surgeon, resulting in one injury, and the first two surgeries would have been statutorily time barred if not included as part of a single continuing medical claim in the patient's pleading).
The "Coverage Part" of the policy in question here identifies it as "Physicians, Surgeons and Dentists Professional Liability Insurance." Such insurance is designed to protect policyholders against liability for errors or omissions in the rendering or failing to render professional services, and coverage varies according to the profession. Timothy W. Burns and Traci M. Braun, E O in the New Corporate Environment, 21 Ins. Coverage L. Bull. 4, May 13, 2003, at 1. While there is no standard form, the purpose of this type of insurance is "to insure a member of a designated calling against liability arising out of mistakes inherent in that particular profession." Albert J. Schiff Assocs., Inc. v. J. Flack,417 N.E. 2d 84, 85 (N.Y. 1980). This comports with the way courts view medical malpractice actions, wherein the "focus in any medical malpractice case should be the procedure performed" by the doctor.Sheeley v. Memorial Hosp., 710 A.2d 161,166 (R.I. 1998). The MMJUA issued Dr. Doe coverage "to furnish professional services as a[/an] "Family Practitioner, No Surgery." The policy is designated an occurrence policy, designed to protect the doctor from damage liability for incidents that occur within the policy term. The policy is a renewal and continuation of a previous policy. The policy limits the amount payable for any single "medical incident" to $100,000 and the total aggregate amount payable to $300,000. At issue in this case is the policy term of April 1997 through April 1998.
A family practitioner[4] is "a doctor regularly called by a family in time of medical need." Webster's Ninth New Collegiate Dictionary at 448 (1991). As such, Dr. Doe was expected to furnish a variety of medical services to regular patients. Lyons was one such patient who regularly called Dr. Doe in time of medical need. Therefore, Dr. Doe's acts in rendering or failing to render appropriate professional services in the treatment of Lyons' diabetes and in the treatment of Lyon's infection were likely the type of acts anticipated by the parties when entering the professional services liability policy. Additionally, the evidence showed that the type of acts required to address the separate maladies was distinct. Dr. Doe failed to properly treat the high blood pressure and diabetes over a course of years — he took too few FBS and A1C tests, he offered too little patient instruction as to diet and lifestyle modification, and he did too little monitoring — continuing into 1998; and that failure resulted in the PVD. Likewise, Dr. Doe failed to properly treat the foot infection when it occurred — he ordered inadequate antibiotics and failed to realize the inadequacy in a timely fashion. These acts resulted in the amputation of the foot.[5] There were two courses of treatment and two resulting injuries. However, there was only one regular patient.
Since it was issued to Dr. Doe in his capacity as a family practitioner, the professional liability policy as a whole clearly envisions the occasion for repeated visits by regular patients, such as Lyons, to address various medical needs as they arise. Additionally, since "an interpretation that reduces certain words to the status of surplusage should be rejected," Andrukiewicz, 2004 R.I. LEXIS 175, at *9, the phrase "all related acts" cannot include acts related merely because they affect only one patient. Such a reading would render the term "related" itself mere surplusage. Had the parties intended to include all acts related to any one patient, the limiting term should have read "[a]ny such act or omission, together with all acts or omissions in the furnishing of such services to any one person shall be considered one medical incident." Therefore, this broadest of interpretations, though perhaps logical, is not reasonable in light of the wording of the policy. Consequently, Plaintiff's argument that the doctor's acts are all related because he was consistently ineffective in treating one patient must fail. This is easily illustrated by a simple example. If Lyons had sought treatment for a wounded arm in the first instance and then later had wounded his leg, the doctor's acts in treating, or mistreating, the separate injuries would not be related, whether or not the treatments were of a consistent quality. Clearly, the acts must be related in some additional manner.
The Plaintiff further asserts that Dr. Doe's acts, or more accurately his omissions, in treating Lyons' illnesses were related because they "impacted upon each other," with one failure compounding the other and causing more reasons for maltreatment. (Plaintiff's Post Trial Memo at 25.) This argument mirrors that of the insurer in Doe, that the doctor's original negligence started "a chain of events, a `domino effect', leading up to" the amputation. 599 N.E. 2d at 990. This Court agrees with the Doe Court that "[t]he `domino effect' . . . does not merge each of the negligent actions into one." Id.[6] While ostensibly focusing on the cause and effect of the doctor's acts, the premise of Plaintiff's argument is that the illnesses are related. The Plaintiff admits that Dr. Doe's failures in treating the hypertension and diabetes led to the early onset of PVD and suggests that these maladies are related to the foot infection. The basic premise of this theory is that persons afflicted with PVD have a greater propensity than others to contract infections in their feet. Therefore, Lyons' infection resulted from the PVD and, derivatively, from the initial negligence of the doctor's treatment of the diabetes. The Plaintiff's argument concludes that the treatment of the infection was a mere continuation of the original negligent "medical incident." The most obvious flaw with this theory is that the actual cause of the foot infection was not established. The experts explained that PVD does not cause infection; it just welcomes infection if and when it appears. People without PVD get foot infections. So, there is the reasonable possibility that the two afflictions were not at all related.
In summary, the policy covered the doctor's acts. The aggregate limitation anticipated the potential for more than one "medical incident" per policy period. The "medical incident" limitation required that the doctor's acts be related in other than a perpatient manner. There are different acts required in the treatment of diabetes than in the treatment of infection. The theories posited by the Plaintiff, as to the meaning of the phrase "all related acts," are either flawed or overly broad. On the other hand, this Court finds that the narrower interpretation given the phrase by the Defendant, based on the facts presented, is closer to the correct one. However, without certainty as to its meaning, and with no further definition of it in the policy, this Court is constrained to find the phrase "all related acts" reasonably susceptible to more than one interpretation and, therefore, ambiguous. Since an ambiguous insurance policy must be construed strictly in favor of the insured, this Court finds that the acts giving rise to Lyons' illnesses or injuries were not related, and that, in fact, two separate "medical incidents" occurred.
 FINDINGS OF FACT AND CONCLUSIONS OF LAW
Accordingly, after careful review of all the evidence introduced, the testimony of the witnesses and memoranda submitted by the attorneys, the Court makes the following findings of fact and conclusions of law.
 1. The MMJUA professional liability policy at issue is a Rhode Island contract. Therefore, Rhode Island law applies.
 2. The professional liability policy is an occurrence policy that does not define occurrence but limits liability based upon "each medical incident."
 3. "Each medical incident" is defined as "any act or omission . . . in the furnishing of professional medical services by the insured" and includes "all related acts or omissions in the furnishing of services to any one person."
 4. "All related acts" is a phrase not defined in the policy.
 5. In furnishing professional services, Dr. Doe failed to properly treat Lyons for diabetes from 1986 through 1998. This failure resulted in the earlier and more severe onset of PVD.
 6. In furnishing professional services, Dr. Doe failed to properly treat an infection in Lyons' left foot in 1998. This failure resulted in the amputation of Mr. Lyons' left leg below the knee.
 7. Lyons suffered two distinct injuries: PVD and the amputation.
 8. Treatment of diabetes involves long term overall lifestyle choices and system monitoring, such as diet, exercise and blood sugar testing.
 9. Treatment of bacterial infections involves aggressive and often localized antibiotic treatments.
 10. Dr. Doe's treatment of the infection was different in form and substance from Dr. Doe's treatment of the diabetes.
 11. Dr. Doe's improper treatment of the diabetes did not cause the left foot infection.
 12. A policy should not be interpreted in a way that reduces certain words to the status of surplusage.
 13. The word "related" would be mere surplusage if the limiting clause encompassed all medical care given to any one person. Thus, the plain and ordinary interpretation of the undefined phrase, "all related acts," does not encompass all medical care rendered by Dr. Doe to Lyons.
 14. The policy clearly provides additional coverage in the event that more than one "medical incident" causes injury to a single patient.
 15. Plaintiff's theory that all of Lyons' medical care by Dr. Doe was related is too broad.
 16. Defendant's narrower reading; that the professional services provided to treat the diabetes were not related to the professional services provided to treat the infection is more reasonable pursuant to a fair reading of the policy.
 17. It is unclear from the policy what type of connection, if any, between the patient's maladies would render acts in treatment thereof "related." Hence, the phrase "all related acts" is ambiguous.
 18. Ambiguous policies are construed strictly against the insurer. Therefore, there were two medical incidents pursuant to the professional liability policy and Lyons is entitled to an additional $100,000 for the second medical incident.
 CONCLUSION
Accordingly, judgment shall enter favor of the Defendant, Richard F. Lyons, and against the Plaintiff, Medical Malpractice Joint Underwriting Association of Rhode Island, in the amount of $100,000 plus interest. Counsel shall prepare an order consistent with this decision.
[1] For purposes of this declaratory judgment action, the parties have agreed to leave out the actual name of the physician. Based on the parties' agreement as to his incompetence, this Court questions the necessity for such anonymity.
[2] The experts who testified at trial produced evidence to show that the medical field has established a link between diabetes and PVD. Evidence was inconclusive regarding the peripheral neuropathy.
[3] The parties agree that Lyons is entitled to the maximum limit of $100,000 for each medical incident established up to the aggregate limit of $300,000. Since Lyons has already been paid for one medical incident, an additional $100,000 is at issue here.
[4] Dictionary.com defines "family practitioner" as "family doctor."
[5] The evidence at trial showed that Lyons, suffering from a worse case of PVD, experienced a subsequent infection in his right foot that was treated properly by a different physician, and only a single toe was lost.
[6] In Doe, the doctor mistreated the patient's diabetes, then, when the patient developed other conditions such as pancreatitis and dehydration, the doctor likewise mistreated those. The court found that the doctor's acts were unrelated because he "committed new and additional acts of negligence," not because he "failed to properly prescribe and monitor certain drugs given months before; . . . because he failed to treat a new condition properly." 599 N.E. 2d at 991.